SILAS A. ROBINSON ET AL., RECEIVERS, *vs.* THE
SECURITY TRUST COMPANY, TRUSTEE.

First Judicial District, Hartford, October Term, 1919.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

The Middlesex Banking Company, a corporation specially chartered by this State and located in Middletown, issued its own debenture bonds from time to time in independent series, and to secure the bonds of each series deposited with the defendant Trust Company,

Robinson *v.* Security Trust Co.

as trustee, collateral consisting mainly of western and southern farm mortgages and the notes of the respective mortgagors equal in amount to the face value of the bonds so secured. The trust agreement, among other things, provided (§ 5), in substance, that whenever any of the debentures so issued should be paid and presented to the trustee, the Banking Company might withdraw such collateral as it might select, equal in amount to the debentures so paid. On November 11th, 1914, certain debentures in Series D, amounting to £1,450 and payable in London, became due and were promptly paid by the Banking Company through its correspondent banks in that city; but the debentures themselves, through no fault of the Banking Company, did not come back to it until April 14th, 1915. Meanwhile, on November 30th, 1914, the directors of the Banking Company voted to go into liquidation, and suspended payment, and the Company then was, and has ever since been, insolvent. In January, 1915, the plaintiffs were appointed receivers, and some months later offered the debentures so paid in London to the trustee and insisted upon their right to withdraw certain specified collateral of equal value which had been deposited to secure payment of all the debentures in Series D. This offer and demand, as well as a later alternative demand for an amount equal to that paid as dividends to the other holders of the debentures in Series D, was refused by the trustee. It appeared that the collateral in the hands of the trustee, most of which it had converted into money, was not sufficient to pay in full the debentures in Series D which were outstanding on November 30th, 1914. *Held:*—

1. That the suit was essentially one to redeem pledged property, between the general creditors, represented by the receivers on the one hand, and secured debenture-holders, represented by the trustee, upon the other.

2. That the payment of its debentures to the amount of £1,450 by the Banking Company on November 11th, 1914, established its right, under the trust agreement, to withdraw a like amount of collateral on deposit with the trustee; that such right was not destroyed by the default of November 30th, 1914, but was exercisable by the receivers before actual liquidation of the securities by the trustee.

3. That to permit a withdrawal now of the collateral to the full amount of the receivers' claim ($7,056 or £1,450) would be inequitable, since this would result in preferring general creditors over secured debenture-holders; and that inasmuch as it had now become impossible to apply equitably the precise remedy or method of adjustment prescribed in the trust agreement, this court would adopt the best available substitute and allow the receivers dividends upon the £1,450 of bonds in their custody, to be paid from

the proceeds of the securities deposited with the trustee, and at the same rate that dividends had been paid and should hereafter be paid, by the trustee to the holders of other outstanding debentures of that series.

Argued October 7th—decided December 22d, 1919.

SUIT to determine the respective rights of general and of secured creditors of the Middlesex Banking Company, an insolvent corporation in the hands of receivers, in and to collateral held by the defendant as trustee, brought to and reserved by the Superior Court in Middlesex County, *Burpee, J.,* upon an agreed statement of facts, for the advice of this court. *Judgment advised for the plaintiffs.*

June 2d, 1897, the Middlesex Banking Company entered into an agreement with the Security Company (now Security Trust Company), under which the Security Company agreed to act as trustee of such collateral as the Banking Comany might deposit as the security for sterling bonds proposed to be issued by the Banking Company. This agreement recited in the whereas clauses, that the Banking Company intended to issue coupon bonds in series of different denominations, bearing different dates of issue and maturity. The form of the bond is set out and contains the following provision, viz:—

"This bond is one of a series of bonds of like form and tenor issued by said The Middlesex Banking Company under and subject to the provisions of a certain agreement between The Middlesex Banking Company and the Security Company of Hartford, Connecticut, as trustee, dated            ; and said The Middlesex Banking Company, in order to secure the payment hereof and of all other bonds of said series, has deposited with the Security Company as Trustee, and in trust for the benefit of the lawful holders of the bonds of said series, certain notes,

obligations, assignments, mortgages or deeds of trust payable in gold coin of the United States of the present standard of weight and fineness, equal in amount, at the rate of $4.867 to the pound sterling to the bonds so issued, and such securities are guaranteed by said The Middlesex Banking Company to be valid and subsisting obligations and securities constituting first liens on real estate in the States and Territories of the United States of America."

Omitting the parts immaterial to the present controversy, the trust agreement appears in the foot-note:

"First: . . . The collateral to be deposited with said Security Company under this agreement shall be notes, obligations, assignments, mortgages and deeds of trust, payable in gold coin of the United States of America of the present standard of weight and fineness and equal in amount, at the rate of four and eight hundred and sixty-seven one thousandths dollars ($4.867) to the pound sterling, to the face of the bonds certified hereunder, and said Banking Company shall assign to said Security Company, as Trustee as aforesaid, such collateral at the time of such deposit. . . .

"Second: Said bonds are to be issued in as many series as the said Banking Company may elect; each series to be of such total amount and to bear such rate of interest as the said Banking Company may at its convenience determine; each several bond of any series may be of such amount as the said Banking Company may find convenient; each bond to become due at a date fixed upon the face thereof, but an option to pay on or after a date named upon the face of each bond and before maturity may be reserved by the said Banking Company.

"Third: The whole or any part of a series of bonds shall on request of the Banking Company be certified by the Security Company and delivered to said Banking Company, upon its depositing with said Security Company collateral to secure the bonds requested to be certified. The collateral securing the whole or any part of any series of bonds shall consist, as hereinbefore provided, of notes or obligations and of mortgages or other instruments, relating thereto; but said bonds shall be certified and delivered to the Banking Company upon its depositing with the Security Company the notes and obligations, and the delivery to the Security Company of such mortgages or other instruments, relating thereto, and which are required by law to be recorded, may be delayed for the purposes of recording for a reasonable time after the delivery of such notes and obligations.

"Fourth: The collateral deposited under this agreement may bear

Under this agreement the Banking Company issued its registered bonds, described as English or sterling debentures, payable in London, known as Series D, serially numbered and of differing amounts and dates

any legal rate of interest, or may bear no interest; but collateral bearing no interest shall be estimated at eighty-five per centum of its face value. Any collateral deposited with said Security Company by said Banking Company under this agreement may at any time be withdrawn by said Banking Company on its depositing with said Security Company other collateral in substitution for and equal in amount to the collateral withdrawn; and all the provisions of this agreement shall apply as well to such substituted collateral as to collateral originally deposited.

"Fifth: Whenever said Banking Company shall surrender to said Security Company any bond issued under this agreement, said Security Company shall deliver to said Banking Company such collateral as said Banking Company may select from the collateral deposited for the security of the series to which said bond belongs equal in amount, as counted at the time of deposit, to such surrendered bond, and thereupon said bond shall be cancelled by said Security Company and returned to said Banking Company. . . .

"Eighth: Until said Banking Company shall have made default in the payment of interest or principal of any bond, it shall have the right to retain all interest coupons belonging to the collateral deposited as security for the series to which such bond belongs; and the right to collect and receive all interest and principal upon such collateral; and the right to pursue at law or in equity any remedy given by the terms of such collateral; and the right to enforce the payment of any such collateral by appropriate proceedings at law or in equity. . . .

"Ninth: A failure to pay any installment of interest due by the terms of any bond, or any portion of the principal thereof, when due, continuing for ninety (90) days after written notice served by mail postpaid or otherwise, on said Banking Company by the Security Company shall constitute a default on the part of said Banking Company within the terms and meaning of this agreement, and the whole of the series to which said bond belongs shall thereupon become due, and said Security Company may sell at public or private sale, the whole or any part of the collateral deposited with it for the series to which such bond belongs; but no sale thereof shall be made at a less rate than the face value with accrued interest of said collateral except upon the written consent of said Banking Company, its successors or assigns; and in case said Security Company shall fail to make such sale on the aforesaid terms, it shall proceed to collect such collateral in such manner as it shall deem best for the interest of the holders of the bonds of said

of maturity, to the amount of £18,850 outstanding November 11th, 1914, and to secure said debentures of said Series D as they were issued from time to time, it deposited with the defendant, under the terms of said trust agreement, collateral consisting of mortgages and other securities, duly assigned.

On November 30th, 1914, the directors of the Banking Company voted to go into voluntary liquidation and to suspend payment, and said Banking Company then was and ever since has been insolvent. The plaintiffs were appointed receivers on January 18th, 1915.

Certain of said debentures, amounting to £1,450 and in dollars and cents to $7,056.72, which matured November 11th, 1914, were paid between November 11th, and November 16th, 1914, when presented in London, by the Banking Company through its correspondent banks. These debentures, so paid, were forwarded from London to the Banking Company through the Hanover National Bank of New York, and were delivered by said bank to the plaintiffs on April 14th, 1915, and the plaintiffs thereupon, across the signature on the face of said bonds, stamped the words "Cancelled Apr. 14, 1915." The delay in delivering said bonds to the plaintiffs occurred through no fault of said Banking Company, or of the plaintiffs, but was the result of a wrongful claim on the part of

series; and the proceeds of such sale or collection, after meeting the reasonable expenses thereof, including reasonable charges of the said Security Company for its services in such sale or collection, shall be applied in payment of the unpaid interest and principal of said series of bonds, ratably and without preference or priority in favor of any bond of said series as against any other bond of said series, the surplus, if any, to be delivered to the said Banking Company, its successors, or assigns. . . ."

The sixth section provides for inspection by the Banking Company of collateral deposited with the Security Company. Section seven provides for registration of the bonds.

said Hanover National Bank that said bank was entitled to retain possession of the bonds.

The defendant first knew, December 20th, 1915, that these bonds, amounting to £1,450, had been paid.

The finding further shows that on November 30th, 1914, the defendant held as collateral security for the outstanding unpaid bonds in Series D, mortgage loans of the face amount of approximately $92,000, made originally to the Middlesex Banking Company and by it assigned to the defendant.

The defendant has proceeded to liquidate this collateral and has collected on all of the mortgage loans deposited with it which have become due, except three made by the Realty Investment Company, and one by the Connecticut Investment Company, subsidiaries of the Banking Company, aggregating $24,400 principal or face value. When collected, the net proceeds of all the collateral deposited with the defendant and held on November 30th, 1914, as security for the bonds of Series D, will not be sufficient to pay in full the unpaid interest and principal of all the bonds outstanding and unpaid on said date of the face amount of £17,400.

On October 9th, 1915, John L. Dower, one of the plaintiffs, offered to surrender to the defendant said bonds amounting to £1,450, and requested the defendant to surrender to him certain certificates of deposit and cash as listed in a letter then presented, claiming that said certificates of deposit were collateral within the meaning of said contract of June 2d, 1897, which the plaintiffs were entitled to have surrendered to them under its fifth article.

Said certificates of deposit were issued by Middletown, Hartford, and Springfield banks, respectively, after December 1st, 1914, and were delivered to the defendant to secure the release and delivery by the

defendant of mortgage deeds and notes which had become due, or soon would become due, and which had been or were being paid through the agency of the Middlesex Banking Company, and the certificates of deposit thus delivered to the defendant represented the proceeds of collection of matured loans which had been held as collateral by the defendant. Said certificates of deposit in each instance were delivered to the defendant as aforesaid immediately after their respective dates, and were cashed by the defendant in December, 1915.

In each instance where, previous to November 11th, 1914, the Banking Company had paid its debentures secured by collateral deposited with the defendant under the contract of June 2d, 1897, said Banking Company had availed itself of its right to an amount of collateral equivalent to the amount of debentures so paid, either by withdrawal of said amount of collateral or by the issuance of new debentures in an amount equivalent to the collateral which said Banking Company was entitled to withdraw; and the defendant had uniformly recognized under said contract the right of the Banking Company to avail itself of collateral in the manner aforesaid. Prior to November 11th, 1914, certificates of deposit were deposited and withdrawn from time to time as collateral under said contract of June 2d, 1897.

The defendant refused on October 9th, 1915, to comply with the demand of the plaintiffs as made by the said Dower, in the manner above stated, and to deliver to the plaintiffs said certificates of deposit specified in said letter, and has ever since refused so to do.

On September 28th, 1916, the plaintiffs made demand of the defendant for the payment of dividends to the plaintiffs on the £1,450 of debentures paid by the Banking Company as hereinbefore stated and

held by the plaintiffs.  This demand was also refused.

Out of the net proceeds of its collections on collateral, the defendant has made three ratable payments on account of the unpaid outstanding bonds in said Series D, aggregating 65% of their face value, but has paid no similar ratable payment upon the £1,450 of bonds paid by the Banking Company as aforesaid, and the defendant has refused to comply with the demand of the plaintiffs for dividends, as made September 28th, 1916, from said date to the present time.

Under date of October 4th, 1915, the Superior Court for Middlesex County, in the receivership proceedings of said Banking Company, in accordance with the decision and opinion of the Supreme Court of Errors rendered upon the application of these plaintiffs and of this defendant and of the Middletown Trust Company, trustee for other bondholders (*Brackett* v. *Middlesex Banking Co.*, 89 Conn. 645, 95 Atl. 12), passed an order instructing the plaintiffs as receivers concerning the matter of the collection of the collateral held by said trustees, wherein it was ordered, adjudged and decreed in part as follows: "That said receivers shall account for and pay over to said Security Trust Company as Trustee, all moneys received by them and all moneys received by said Middlesex Banking Company after December 1, 1914, which came into the hands of the receivers on account of the collateral held by said Security Trust Company as Trustee, including interest, whether such payments became due before, on or after December 1, 1914, it being further provided that if said parties cannot agree as to the amount which shall be paid to the trustee, and as to the amounts, if any, which shall be allowed to the receivers on account of their services and expenses in connection therewith, application

shall be made to the court for the consideration and approval of such account.

"If and when, in the future, moneys, checks, drafts or orders in any form shall be received by the receivers for or on account of loans or other collateral held by either of said Trustees, said receivers shall notify the Trustee to whose collateral the same relates, and upon request shall turn the same over to said Trustee, endorsing such instrument or order to the order of said Trustee without recourse to the said receivers."

Upon these facts the case was reserved for the advice of this court upon the following questions:—

1. Whether or not upon the pleadings and the agreed statement of facts, the plaintiffs, receivers, were entitled to receive from the defendant trustee, upon the presentation of the bonds paid in London in November, 1914, and tendered to the defendant, the certificates of deposit and cash specified in Exhibit 1.

2. Whether or not the plaintiffs, receivers, as holders of said bonds, were entitled to receive from the defendant trustee their pro rata share on account thereof of all moneys distributed by the defendant trustee to the holders of the outstanding bonds in payment of the unpaid interest and principal on said series of bonds.

3. Whether or not the plaintiffs, receivers, were entitled to receive, on account of the payment or presentation of said bonds, any of the property held as security on November 30th, 1914, by the defendant trustee for the payment of said series of bonds, or any of the proceeds thereof, before the holders of the outstanding unpaid bonds have been paid the full amount of unpaid interest and principal.

4. Whether or not the plaintiffs, receivers, are entitled to receive from the defendant trustee any

portion of the proceeds of the collateral except the surplus, if any, remaining after the unpaid interest and principal on the outstanding bonds shall have been paid in full.

5. What judgment should be rendered upon the agreed statement of facts and of claims of the parties.

*Francis W. Cole,* for the plaintiffs.

*Charles Welles Gross,* for the defendant.

GAGER, J.   This action is in the nature of an action to redeem.   The question to be determined is whether the trustee may, as against the receivers, retain all of the securities deposited for a series of bonds for the benefit of the unpaid bondholders of this series, in a case where the Banking Company paid part of the bonds in the regular course of business, but was unable to surrender the bonds so paid for cancellation before default as to the remaining bonds and appointment of receivers, by reason of the fact that the bonds were in a foreign country when paid and the bank through which they were forwarded from London to the Banking Company unlawfully retained possession of the bonds, thus delaying delivery of possession of the bonds until after the receivers were appointed. The answer depends upon the construction of the trust agreement set out in the statement of facts, and particularly the construction of section five.

The agreement itself is not a contract relating to any specific property or any specific debt.   No security or property right of any kind is created by the execution and delivery of the instrument.   It becomes effective as fixing the terms of a trust in the nature of a mortgage, only when thereafter the Banking Company deposits securities and issues debentures

or bonds based thereon in as many series and for such amounts as the Banking Company may determine, and these bonds and securities are brought under the terms of the trust agreement by a simple reference thereto contained in the bond. The one contract, not in itself creating any security, may be applied to any number of groups of securities and bonds based thereon by reference to the trust deed, and each such group of securities when created becomes a separate trust quite independent of any other series that may be issued under the agreement. A peculiarity of this trust agreement, appearing both in the bond and the agreement, arises from the fact that sterling bonds were proposed to be issued on American securities. It is specifically provided, both in the form of the bond and in the agreement itself, that for each pound sterling of bonds issued in any series, the Banking Company should deposit with the trustee securities payable in gold coin of the United States equal in amount at the exchange rate of $4.867 to a pound sterling of the bonds so issued, as valued at the time of deposit. This was the only fixed unit of security, and the collateral furnishing such security might be changed by substitution, at the pleasure of the Banking Company, and also withdrawn on surrender and cancellation of any bond or bonds, the only requisite of the agreement being that the collateral, at original valuation, should be maintained at the contractual standard of quantity. In this respect the agreement is quite unlike the ordinary mortgage or deed of trust in the nature of a mortgage, in which the entire property or collateral is and will remain pledged for the payment of all and every part of the debt secured until final payment thereof.

A further peculiarity of the agreement was that whenever any bonds of a series were surrendered by

the Banking Company the Company might withdraw, from the collateral deposited to secure the bonds of that series and out of the obligations imposed by the trust agreement, any collateral it chose, on the basis of $4.867 to the pound sterling. Section five giving this right to the Banking Company, reads as follows: "Whenever said Banking Company shall surrender to said Security Company any bond issued under this agreement, said Security Company shall deliver to said Banking Company such collateral as said Banking Company may select from the collateral deposited for the security of the series to which such bond belongs equal in amount, as counted at the time of deposit, to such surrendered bond, and thereupon said bond shall be cancelled by said Security Company and returned to said Banking Company." It therefore appears that all the securities the bondholders were entitled to, and all the trustee could assert its right over, consisted only of such American securities of the kind described in the agreement as were, when deposited, of the value of $4.867 gold coin for each pound sterling of bonds outstanding. Non-interest bearing securities were valued at the arbitrary rate of eighty-five per cent. Therefore, by the express terms of the contract, the Banking Company could on withdrawal select such securities as it desired, figured on the deposit basis of valuation, and the remaining bonds still had all the security contracted for and the full amount of collateral originally pledged for their payment. The obvious purpose of this provision was that the collateral withdrawn could be at once used as the basis for a new series of bonds under the same or any other trust agreement, or put to any other use the Banking Company desired. The distinguishing feature of this trust agreement is that so long as the trustee held collateral in the given series

of the value, when deposited, of $4.867 for each pound sterling outstanding, the terms of the agreement were fully met, and it was as much the duty of the trustee to surrender the collateral on surrender of the bonds, as to hold collateral to meet outstanding bonds. The ratio of values was definitely determined by the agreement. This arrangement, at the option of the Banking Company, automatically kept the collateral for any series down to the ratio of $4.867 to the pound sterling of bonds outstanding in that series.

When, therefore, as appears from the finding, the Banking Company, on November 11th, 1914, paid in London bonds out of the series in question amounting to £1,450 as then due, the Company at once had the privilege of surrendering these bonds to the trustee, and receiving from the trustee such collateral as the Company might select, equal in value to the £1,450 at the rate of $4.867 to the pound, as counted at the time of deposit. The liability attaching to the collateral in that series had been reduced from £18,850 to £17,400. Had the Banking Company been able at once to have taken these bonds to the trustee, the right of the Banking Company to receive, and the duty of the trustee to deliver, under the terms of section five, would have been clear, and in conformity with the previous transactions between the parties under similar circumstances. But the bonds were in fact paid in London and were forwarded through the Hanover National Bank of New York. This bank, on account of a wrongful claim, retained possession of these bonds until April 14th, 1915, some three months after the appointment of the receivers. On November 30th, 1914, the Banking Company suspended payment, thereby making default. *Brackett v. Middlesex Banking Co.*, 89 Conn. 645, 660, 95 Atl. 12. The plaintiffs were appointed receivers January

18th, 1915, but, through no fault of their own or of the Banking Company, did not receive the bonds until April 14th, 1915.    The trustee was informed of the payment December 20th, 1914, and, for reasons not appearing and which therefore we must deem sufficient, it was not until October 9th, 1915, that Mr. Dower, one of the receivers, offered to surrender these bonds to the trustee and demanded the return of specific collateral named by him under the provisions of section five.    On the same date the trustee refused compliance.    September 28th, 1916, the receivers further demanded, as an alternative claim, dividends on the £1,450 pounds of bonds paid November 11th, 1914, on the same basis as other holders of bonds of that series.    This demand was also refused.    The situation now is that the trustee holds collateral, deposited under the trust agreement to secure £18,850 as security for £17,400 of bonds remaining outstanding, and refuses to surrender the proportionate collateral for the £1,450 of bonds paid by the Banking Company when a going concern, which could not be in fact surrendered before the suspension owing to delay caused by distance and the wrongful acts of the New York bank.    Refusing to receive the bonds, the trustee also necessarily refused to cancel them as provided for under the terms of section five; and the trustee claims it should hold and apply the collateral which would have been released by the surrender and cancellation of £1,450 of bonds, for the benefit of the holders of the £17,400, thereby increasing by so much the security of the holders of these remaining bonds above the security called for by the trust agreement.    This retention of securities by the trustee also necessarily operates to decrease, by their value, the assets in the hands of the receivers available for general creditors, when, at the time the bonds were

paid by the Banking Company, it could anticipate and apparently rely upon the making good the cash requisite for the payment of these bonds, by the securities provided to be surrendered on the delivery of the paid bonds to the trustee, and was only prevented from surrendering these bonds by physical inability due to distance and wrongful conduct of the New York bank.

We do not think this claim and the action of the trustee can be justified upon the facts, under any equitable construction of the contract. In effect, though not in name, section five is a clause providing for partial redemption, and, like the redemption clause in a mortgage, should not be given a literal construction which will cut off the right of redemption contrary to the manifest intent of the agreement. Under our well-settled law, the receivers here represent the creditors of the Banking Company, confessedly insolvent, so that the contest is not really one between the maker of the bonds and the trustee, but between groups of creditors, the unsecured represented by the receivers, and the secured represented by the trustee. In paying these bonds the Banking Company depleted its assets £1,450 or, as agreed, $7,056.72, but it had as a consequence, the privilege immediately to surrender these bonds and receive back collateral of the amount of $7,056.72. This privilege was a valuable asset and existed at the time of the suspension of payment and passed to the receivers for the benefit of the general creditors of the Banking Company. To refuse to permit the receivers to surrender these bonds and get back a proportionate amount of collateral, violates the letter and spirit of the trust agreement, and operates to prefer the remaining debenture holders over general creditors by increasing the amount of collateral held for their

benefit above that called for by the trust agreement, and to that extent diminishing the fund available for the general creditors. This could not be done before suspension of payment on November 30th, and there is nothing in the trust agreement which destroys the right of the Banking Company confessedly existing upon that date.

The fundamental contention of the trustee is that the Banking Company, having made default November 30th, 1914, no longer had any rights under the contract. This principle is frequently applied to certain executory contracts. But the cases cited in its support, applicable to the facts of those cases, are not controlling in the present situation. A closer proposition advanced by the trustee is based upon a class of cases which hold that a mortgagor in a mortgage permitting a partial release upon partial payment of the debt, is not entitled to exercise this privilege after a default has occurred, because of which the entire amount of the indebtedness has become due. *Clarke* v. *Cowan,* 206 Mass. 252, 92 N. E. 474, cited by the trustee, was a case where, after the whole debt became due, an assignee of a second mortgage— after foreclosure of his mortgage—attempted to assert his claim under a provision in the first mortgage that the mortgagee would release and quitclaim any lot upon payment of a certain sum per lot. The court held that the privilege was personal to the mortgagor, and also that it could not be exercised after the debt became due under the terms of the contract. In *Reed* v. *Jones,* 133 Mass. 116, the attempted exercise of a similar privilege two years after the whole debt became due was denied. *Chrisman* v. *Hay,* 43 Fed. Rep. 552, recognized the right as existing after default but before foreclosure, but held that it expired upon the bringing of a foreclosure suit. *Fulton* v. *Jones,*

167 N. Y. App. Div. 765, 153 N. Y. Supp. 87, was a case where the provision was that the mortgagee would release one of two parcels of land on payment of one half the debt. This was attempted to be done after default on the whole debt, and the court by a three to two opinion denied the claim because made after default. This view of the law is, however, by no means invariably accepted, and there is much authority for the proposition that such a privilege of partial release on partial payment, when clearly stated in the mortgage, can be enforced at any time before foreclosure.

In Jones on Mortgages (Vol. 2, 7th Ed.) § 981, after citing *Reed* v. *Jones*, 133 Mass. 116, and *Chrisman* v. *Hay*, 43 Fed. Rep. 552, the text goes on: "But on the other hand, construing such agreements in connection with the other provisions of the mortgage, and in the light of the manifest purpose which it was designed to subserve, it may be necessary to hold that the right to a partial release upon the stipulated terms continues until the mortgagee has fully executed the power of sale, or has otherwise foreclosed the mortgage." See also *Clark* v. *Fontain*, 135 Mass. 464, 144 Mass. 287, 10 N. E. 831; *Vawter* v. *Crafts*, 41 Minn. 14, 42 N. W. 483; *American Net & Twine Co.* v. *Githens*, 57 N. J. Eq. 539, 41 Atl. 405; *Commercial Bank of Iron Mountain* v. *Hiller*, 106 Mich. 118, 63 N. W. 1012.

But whatever might be the rule if the case were in fact one of default, we do not think it applies to the facts of this case, for the claim of the receivers is primarily based upon the act of the Banking Company in paying the bonds in question in London on November 11th, nearly three weeks before the act of default by suspension of payment on November 30th. It is true that the attempted surrender of bonds did not occur until October 9th, 1915. But the Banking

Company had done the essential thing in paying these bonds when due, and had become entitled to possession of the bonds before the default. Neither the Company nor the receivers had done any act waiving their rights based on possession. The surrender of the bonds called for by the contract was the mere formality requisite to establish for the trustee the fact that the bonds thereafter no longer existed as a claim against the securities deposited for that series of bonds, thus justifying the trustee in surrendering securities proportionate to the bonds cancelled. Whether the bonds were paid at maturity, as in fact they were, or had been certified to the Banking Company but never issued by it, was immaterial. The offer to surrender was notice to the trustee that the obligations of the series were so much reduced, and that under the provisions of the contract securities to that extent should, if desired by the Banking Company, be released. There is not a word anywhere in the agreement providing that the trustee could, under any circumstances, when bonds were presented, hold on to securities beyond the amount called for. The manifest intention of the contract is to provide for the adjustment of the quantity of security proportionate to the amount of outstanding bonds, on the valuation counted at the time of deposit. It further appears from section five of the agreement quoted above, that upon the surrender of any bond it is the duty of the trustee to cancel it and return it to the Banking Company. This is manifestly for the protection of the trustee, as well as for the advantage of the Company. The trustee has no means under the agreement of knowing what bonds are outstanding other than its cancellation record. The trustee must, for its own protection, assume that all bonds not cancelled are outstanding. The

refusal to cancel, when requested upon surrender of a bond, and to deliver up corresponding securities, results in a retention of securities in excess of those called for by the agreement. This in effect is, as between creditors, to create an unauthorized preference in favor of bonds not cancelled. The receivers, in making the demand, were not asserting any right not existing prior to the suspension of the Company. Nor were they assignees of the rights of the Banking Company, and there is no foundation for the claim made that the right was personal to the Banking Company and was not exercised by it. For that purpose the receivers were the Banking Company. General Statutes, § 6083. Under the terms of the agreement as we interpret it, the receivers were entitled to securities which should have been released, and there was nothing in the default of November 30th, 1914, which destroyed this right if exercised before actual liquidation of the securities. The effect of liquidation will be discussed later.

The trustee further bases a defense upon the ninth, or default, clause of the agreement. It is to be remembered that there was no default as to these bonds. The default was the act of suspension after these bonds were taken up at maturity, and therefore did not apply to these bonds already paid. Section nine provides that after default "the whole of the series to which said bond belongs shall thereupon become due, and said Security Company shall sell at public or private sale, the whole or any part of the collateral deposited with it for the series to which such bond belongs," and that the proceeds "shall be applied in payment of the unpaid interest and principal of said series of bonds, ratably and without preference or priority in favor of any bond of said series against any other bond of said series." This clause manifestly

refers to outstanding bonds and collateral lawfully remaining in the trustee's custody for the protection of outstanding bonds. We agree with the trustee that if no collateral has been taken out or is equitably to be regarded as taken out under section five, the entire collateral in hand may be applied, though it is in excess of the quantity per pound sterling called for under the agreement. But when collateral which the Company or its receivers had demanded on surrender of bonds, is held in custody because the trustee refused to honor the requirement of section five, the default does not convert such securities into additional security for outstanding bonds. The default does not, in terms or by implication, constitute a justification for such appropriation, for there had never been any default as to these bonds in question. Under such circumstances, for the purpose alone of liquidating and appropriating securities, all bonds of a series not formally cancelled because of violation by the trustee of the provisions of section five, are to be regarded as outstanding as to the trustee improperly retaining possession of their proportion of the securities.

The receivers made two different demands. The first on October 9th, 1915, was for certain certificates of deposit in National banks and cash, of the value, in the whole, of $7,056.72, on surrender of £1,450 of bonds. Upon the refusal of the trustee to honor this request, the receivers, on September 28th, 1916, claiming as holders of bonds of Series D, amounting to £1,450, demanded payment on such bonds of any dividends declared on that series of the bonds, which claim and demand were also refused. It appears that the trustee, acting under orders of court passed on October 4th, 1915, pursuant to the opinion of this court in *Brackett* v. *Middlesex Banking Co.*, 89 Conn.

645, 95 Atl. 12, forthwith proceeded to liquidate the securities held under the trust agreement, and that at the time of this reservation the liquidation had proceeded so far as to show that the net proceeds of all the securities in the hands of the trustee would be insufficient, owing to depreciation of some securities below the valuation at which they were originally deposited, to pay in full the interest and principal of the £17,400 of bonds remaining after deducting the £1,450 taken up by the Banking Company from the total series of £18,500. It also was found that the collateral named in the receivers' demand of October 9th, 1915, was cash and certificates of deposit in banks, cashed without loss by the trustee in December, 1915, that is, were securities on which there was no depreciation. Because of the insolvency of the Banking Company, the contest is now between general creditors and secured bondholders. To allow the receivers, representing creditors, now to receive out of the trust fund, cash for £1,450 of bonds in full, while the remaining bondholders receive a percentage, would operate to prefer the receivers as holders of these bonds over the holders of other uncancelled bonds. By the changed circumstances, it is impossible now to apply the precise method of the agreement, based on equality in values of the securities deposited for the series of bonds, and the other bondholders should not now be penalized because of the failure of the trustee to admit the claims of the receivers, as to which some doubt might well exist when the first demand of the receivers was made. Neither should general creditors be injured because of such refusal of the trustee. If the precise remedy originally existing cannot now equitably be granted, the court can do the next best thing. *Mooney* v. *Byrne*, 163 N. Y. 86, 57 N. E. 163, though not exactly in point, illustrates

the principle. That was a case of mortgage by absolute deed, where the mortgagee had conveyed the land so mortgaged to an innocent purchaser. The mortgagor having brought an action to redeem, and redemption of the land being impossible by reason of the mortgagee's conveyance, judgment was rendered for compensation based on the value of the mortgaged premises at the time of trial, as the best available substitute for foreclosure. The present action is in the nature of an action for partial redemption, and we find that the securities have been largely converted into a common fund under order of court. For the purpose alone of granting the best equitable substitute now possible, for securities not surrendered on October 9th, 1915, the receivers should be allowed dividends upon the bonds held by them, out of the proceeds of the securities held by the trustee for all uncancelled bonds, at the same rate as are paid to the holders of the remaining uncancelled bonds. This allowance is not as payment on account of the £1,450 of bonds, for they have been paid by the maker, but as a substitute for the value of securities to which the maker and its receivers were entitled when they presented these bonds for cancellation, October 9th, 1915, and in money value is the same in amount as would have been payable had the trustee allowed the second claim of the receivers. In this way the relative rights of secured and unsecured creditors are equitably enforced.

A further claim made by the defendant is that the certificates of deposit specified in the receivers' demand for securities were not collateral at all, but the proceeds of matured collateral, and therefore in no event subject to call. Whatever the origin of these certificates, they were, upon the finding, placed in the hands of the trustee as a substitute for maturing

collateral which the Banking Company desired to take out and collect, thus maintaining the securities at the contract standard. As a substitute they were, as to the trustee and bondholders, security in the same way as those for which they were substituted. All property of the Banking Company, whether first liens, cash, or any other property, accepted and held by the trustee to insure the payment of bonds, was collateral, until in fact appropriated to the payment of defaulted bonds.

Some subordinate claims are made by counsel, but in view of the conclusion reached, it does not appear necessary to extend this opinion by their discussion.

Upon the construction of the particular contract before us, we therefore hold that the plaintiff receivers are entitled to receive from the defendant trustee, out of the net proceeds of all the securities held by it as security from the entire series of bonds known as Series D, and amounting to £18,500, such a proportion of said net proceeds as the amount of the bonds presented by the receivers to be cancelled, £1,450, bears to the amount of the entire series, £18,500, and advise judgment accordingly.

No costs are to be taxed in this court.

In this opinion the other judges concurred.